Hedrick v. Southland Corp.

LOUISE HEDRICK, Widow, ISAAC EARL HEDRICK, DECEASED, Employee, Plaintiff v. SOUTHLAND CORPORATION, t/a 7-ELEVEN FOOD STORES Employer and THE TRAVELERS INSURANCE COMPANY, Carrier, Defendants

No. 7810IC569

(Filed 5 June 1979)

1. **Master and Servant § 93.2— workmen's compensation—plaintiff's social security file—medical records—admissibility**

In a proceeding before the Industrial Commission to determine if plaintiff was entitled to receive lifetime compensation payments for the death of her husband because she was disabled at the time of his death, no prejudicial error occurred by reason of the introduction of plaintiff's social security file containing medical reports, since it presented plaintiff's medical background and corroborated her testimony and the testimony of her children, and there was ample evidence, aside from the medical records, upon which the Commission could have based its findings of disability.

2. **Master and Servant § 94.1— workmen's compensation—conclusion that plaintiff disabled—sufficiency of evidence**

Evidence that plaintiff was a chronic alcoholic and that she suffered from various other medical problems was sufficient to support the Industrial Commission's conclusion that plaintiff was unable to support herself by reason of physical and mental disability as of the date of her husband's death.

3. **Master and Servant § 94— workmen's compensation—disabled spouse—no finding of permanent disability required**

G.S. 97-38, the statute providing compensation for life or until remarriage for the disabled spouse of an employee who dies under compensable circumstances, does not on its face require a finding of permanent disability.

APPEAL by defendants from the North Carolina Industrial Commission opinion and award of 27 December 1978. Heard in the Court of Appeals 8 March 1979.

Defendants appeal from the Commission's finding that plaintiff is entitled to receive lifetime compensation payments for the death of her husband because she was disabled at the time of his death. Plaintiff's husband died under compensable circumstances on 3 October 1975. The award was made pursuant to G.S. 97-38 which, in pertinent part, is as follows:

"Compensation payments due on account of death shall be paid for a period of 400 weeks from the date of the death of the employee; provided, however, after said 400-week period

in case of a widow or widower who is unable to support herself or himself because of physical or mental disability as of the date of death of the employee, compensation payments shall continue during her or his lifetime or until remarriage . . . ."

Plaintiff's evidence tends to show the following. When her husband died she was 56 years old and lived alone. Her two adult children lived in other towns. She worked for Thalhimers prior to 1971 but has not been employed since. Plaintiff testified that she had been deeply depressed during the two to three years prior to her husband's death. She had a degenerative disc problem and had been in and out of the hospital. When she stood for too long her ankles would swell and cause pain. She suffered from these conditions on the date of her husband's death. Plaintiff also testified that she had had shock therapy and psychiatric treatment. Before and after her husband's death, plaintiff was an alcoholic.

Plaintiff's children testified that their mother had a back problem and that her ankles used to swell. She had been in and out of the hospital since they were children. For four or five years before her husband's death, plaintiff drank all day long. She was drinking the night he was killed. Their mother is incapable of working.

Plaintiff's Social Security records which included medical reports were introduced into evidence. They showed that she had applied for disability benefits on 27 August 1971 and it was determined that she was entitled to these payments. That determination was still in effect at the time of her husband's death. Plaintiff's medical records from Watts Hospital were also introduced. Defense counsel objected to the introduction of any records which contained diagnoses and treatments made by medical personnel but this objection was overruled.

Dr. James Davidson testified that he first saw plaintiff in 1971 for backaches and a urinary tract infection. She was hospitalized in January, 1975 for diverticulitis. On 13 November 1975 she came to him again for backache and urinary tract infection. Subsequent to her husband's death, she was suffering from delirium tremens after being hospitalized for a broken ankle. Dr. Davidson diagnosed her as a chronic alcoholic.

The Deputy Commissioner found that plaintiff had a history of multiple hospitalizations for anxiety, drug toxicity, neurosis, barbituate poisoning, psychoneurosis, attempted suicide and multiple physical ailments. The Commissioner included findings as to diagnoses made by various doctors who treated plaintiff between 1971 and 1975. He concluded that plaintiff was unable to support herself because of physical and mental disabilities and, therefore, was entitled to compensation benefits for the initial 400 weeks and thereafter during her lifetime or until she remarried, absent a change of condition.

The Commissioner's opinion and award was affirmed and adopted by the Full Commission with some amendments, including the striking of the change of condition contingency from the award. From this decision, defendants appealed.

*Haywood, Denny & Miller, by George W. Miller, Jr., and Charles H. Hobgood, for plaintiff appellee.*

*Gene Collinson Smith, for defendant appellants.*

VAUGHN, Judge.

[1] Defendants first contend that the Commission erred in allowing into the record the plaintiff's social security file containing medical reports of various doctors and in using these reports to establish plaintiff's disability under G.S. 97-38. The Deputy Commissioner made the following findings of fact, based on these records, which were adopted by the Full Commission.

> "8. On June 25, 1973, Dr. Robert A. Huffaker, a psychiatrist with offices in Durham, North Carolina, reported his findings concerning a psychiatric evaluation of the plaintiff widow. At that time she gave a history that she began to have incapacitating symptoms approximately four years prior to said examination, including increased back pain, a presumptive diagnosis of rheumatoid arthritis, a possible diagnosis of gout, possibly a diagnosis of kidney disease, et cetera. She translated her pain into difficulties on her job which required lifting and bending and, therefore, she stopped working. She indicated that the pain in her back and legs had increased over the past four years, that her weight had increased 50 to 75 pounds over that period and she had

become more aware of an underlying sense of depression; that during said period she felt essentially unable to do anything constructive for herself or her working situation, felt totally at a loss in regard to her personal worthwhileness, in regard to her home situation and family, and in regard to her work situation. She stated at that time: 'I feel I have been a total wreck, mentally and physically.'

"Dr. Huffaker surmised that changes in plaintiff widow's home environment probably played a significant role in contributing to her 'apparently exaggerated feelings of illness'; at that time the two children were going away from home, the daughter having married and the son being away in college. Plaintiff expressed a strong feeling that she had worked all her life and deserved to be taken care of and helped. She expressed a feeling of being used and not being loved for herself; and even indicated that she was adopted as a child because her family wanted someone to use to do the chores. Dr. Huffaker expressed the opinion that plaintiff, throughout her life, had been plagued by anxieties and insecurities.

"In summary, Dr. Huffaker stated that plaintiff had stopped functioning as a productive and self-sufficient individual in recent years; that plaintiff was preoccupied with somatic problems and denied psychological difficulties; that her then present pattern of dependency and somatic preoccupation appeared fixed; that it was doubtful that said condition can be reversed at that time without a major change in her life circumstances; that the prognosis for self-sufficiency appeared highly guarded and uncertain; that plaintiff should receive psychotherapy (although she appeared highly resistant to psychiatric treatment) and drug therapy for depression and tension. Dr. Huffaker diagnosed plaintiff's condition as 1) passive-dependent personality disorder, severe, probable; 2) involutional depressive reaction, masked, with preoccupation with somatic symptoms, moderate, possible.

"9. On October 10, 1972, plaintiff widow was examined by Dr. W. Raney Stanford of Durham, North Carolina. At that time her history included the following: she complained of pain in the lumbo-sacral spine and in her left ankle existing for two years and progressively getting worse; she

Hedrick v. Southland Corp.

complained of incapacitating pain and multiple other problems and indicated that her husband did most of the housework. Dr. Stanford diagnosed plaintiff's condition as: 1) hypertrophic arthritis: disc disease of spine. Involvement of left ankle and both elbows. Very crippling arthritis. 2) Conjunctivitis. Obesity. Some acid indigestion. 3) Neurosis with anxiety state.

"An x-ray done on May 11, 1971 by Dr. Donald M. Monson showed, inter alia: advanced degenerative disc disease at L5-S1, with virtually complete loss of the intervertebral disc substance; so-called reverse spondylolisthesis of L5 posteriorly on S1 incident to the degeneration; moderately advanced degenerative joint disease involving the lower lumbar apophyseal joints; mild left lumbar rotoscoliosis; early degenerative changes about both sacroiliac joints apparently without change since 1966 studies. Degenerative changes in the lumbar spine had progressed considerably in that interim, however.

"An x-ray done on May 14, 1971 by Dr. John F. Sherill, Jr. showed diffuse narrowing of the C5-C6 and C6-C7 interspaces with a moderate hypertrophic spurring about the anterior aspects of the vertebral bodies, minimal posterior spurring, the changes being those of degenerative disc disease.

"Plaintiff was examined by Dr. Eulyss R. Troxler, an orthopedist practicing in Greensboro, on April 17, 1973, who reported x-ray findings of mild scoliosis to the left, some hypertrophic changes in the lumbosacral area, minimal lipping of the upper fifth lumbar vertebra and slight narrowing of the lumbosacral joint; no definite spondylolisthesis and a small spur on the weight bearing portion of the left heel. Dr. Troxler was of the opinion that plaintiff could perform light work on an eight-hour basis, being able to sit without difficulty, walk and lift up to 20 to 25 pounds and could carry, push or lift the average load of an adult woman. He also expressed the opinion that plaintiff could have difficulty climbing stairs."

Generally, these reports would be hearsay and not admissible. Nevertheless, medical records are allowed into evidence as an

exception to the hearsay rule if they are made in the regular course of business, made contemporaneously with the events by one authorized to make them, and are identified and authenticated. *Sims v. Insurance Co.*, 257 N.C. 32, 125 S.E. 2d 326 (1962). The problem arises, however, when medical records contain diagnostic opinions of physicians who are not available for cross-examination. When such diagnoses are ordinary findings based on objective data, the tendency is to allow the opinion into evidence. On the other hand, if the diagnosis is purely speculative, the courts will exclude such evidence. C. McCormick, Handbook of the Law of Evidence § 313 (2d Ed. 1972). Between these two extremes, however, lie opinions based on subjective data or involving problems of interpretation such as psychiatric diagnoses; the courts will usually allow these opinions into evidence. McCormick, *supra*. In *Thomas v. Hogan*, 308 F. 2d 355 (4th Cir. 1962), the Fourth Circuit ruled that the trial court committed prejudicial error in excluding a medical record showing the results of a blood test. The Court stated that routine diagnoses and tests made in the regular course of business should be allowed into evidence. The Court observed that

> "There is good reason to treat a hospital record entry as trustworthy. Human life will often depend on the accuracy of the entry, and it is reasonable to presume that a hospital is staffed with personnel who competently perform their day-to-day tasks. To this extent at least, hospital records are deserving of a presumption of accuracy even more than other types of business records." *Thomas v. Hogan, supra*, at 361.

A contrary position was taken in *New York Life Insurance Co. v. Taylor*, 147 F. 2d 297 (D.C. Cir. 1944), where the Court refused to allow into evidence medical records containing a psychiatric diagnosis. The records were introduced to prove the suicidal intent of the decedent. The Court felt that a psychiatric diagnosis involved conjecture and opinion and should, therefore, be subjected to cross-examination.

The introduction of medical records in federal courts is now governed by Rule 803(6) of the Federal Rules of Evidence. This rule provides for the business records exception to the hearsay rule to apply to any "memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or

diagnoses . . . if kept in the course of a regularly conducted business activity." The notes of the Advisory Committee indicate that Rule 803(6) conforms to the holding in *Thomas v. Hogan, supra*, by specifically allowing records containing opinions and diagnoses into evidence.

In the present case, we conclude that no prejudicial error occurred by reason of the introduction of the medical records. They presented plaintiff's medical background and corroborated her testimony and the testimony of her children. There was also ample evidence, aside from the medical records, upon which the Commission could have based its findings of disability.

[2] Defendants next contend that the evidence was insufficient to support the findings of fact, that the findings of fact were improper because they merely summarized the evidence, and that the conclusions of law were not supported by findings of fact based on competent evidence. On appeal, this Court is limited to the questions of whether the findings of fact are supported by competent evidence and whether the conclusions of law are justified by these findings. *Gaines v. Swain & Son, Inc.*, 33 N.C. App. 575, 235 S.E. 2d 856 (1977). The Commission must make specific findings with respect to crucial facts upon which the right to compensation depends. *Gaines v. Swain & Son, Inc., supra; Smith v. Construction Co.*, 27 N.C. App. 286, 218 S.E. 2d 717 (1975). Defendants contend that the Commission's recitation of the medical records and the testimony of plaintiff, her children and Dr. Davidson were insufficient findings of fact. Defendants rely on *Gaines v. Swain & Son, Inc., supra*, wherein this Court held that since the crucial findings made by the Commission were merely recitations of the evidence, they were not sufficiently positive and specific to enable the Court to judge the propriety of the order. In *Gaines*, there is no indication that the Commission ever specifically found that the injury was caused by a work-related accident. In the present case, however, the Commission specifically found that "[p]laintiff widow was unable to support herself by reason of physical and mental disability as of the date of the deceased employee's death, her conditions including degenerative disc disease, severe passive-dependent personality disorder and alcoholism." This finding is sufficiently positive and specific to enable this Court to review the order. Furthermore, the evidence supports this finding. Plaintiff and her two children were competent to testify about her health and her ability to work. *Carter v. Bradford*, 257 N.C. 481, 126 S.E. 2d 158 (1962); *Kenney v. Kenney*,

15 N.C. App. 665, 190 S.E. 2d 650 (1972); 1 Stansbury, N.C. Evidence 2d § 129 (Brandis rev. 1973). In addition to the testimony showing that plaintiff was a chronic alcoholic, there was also evidence showing that she suffered from various other medical problems. This evidence was sufficient to support the finding that she was disabled.

[3] Finally defendants contend that the Commission erred in awarding plaintiff lifetime compensation. The Commission determined that the plaintiff was entitled to compensation for life or until she remarries. This award follows the wording of G.S. 97-38 which does not on its face require a finding of permanent disability. The question of whether the award may be modified upon a showing of a change in plaintiff's condition is not presented by this appeal.

Upon review of the Commission's order, we hold that the findings of fact are supported by competent evidence and that the conclusions of law are supported by the findings of fact.

Affirmed.

Judges ERWIN and MARTIN (Harry C.) concur.